Brian W. McELROY and Catherine R. McElroy, his wife, Plaintiffs,

v.

ALBANY MEMORIAL HOSPITAL, Alan Moskowitz, M.D., Alan Moskowitz, M.D., P.C., d/b/a Center for Scoliosis and Spine Disorders, Donald Calley, M.D., and Marvin Kim, M.D., Defendants.

No. 1:01 CV 1130 LEK/DRH.

United States District Court, N.D. New York.

Sept. 2, 2004.

William J. Cade, Cade, Saunders Law Firm, Albany, NY, for Plaintiffs.

Kerriann P. Coleman, O'Connor, Yoquinto Law Firm, Troy, NY, Christine K. Krackeler, D'Agostino, Krackeler Law Firm, Menands, NY, Michael Catalinotto, Sr., Maynard, O'Connor Law Firm, Albany, NY, for Defendant.

### MEMORANDUM–DECISION AND ORDER [1]

KAHN, District Judge.

## I. Background

On January 19, 1999, plaintiff Brian McElroy ("McElroy") underwent spinal surgery in the form of posterior lumbar interbody fusion of the spine at L5–S1. McElroy and his wife, Catherine (collectively, "Plaintiffs"), allege that, following the surgery, McElroy, who had never experienced visual impairment, visual loss, or any form of blindness prior to January 19, 1999, was rendered blind in both eyes as a

---

1. For printed publication in the Federal Reporter.

result of negligence and malpractice on the part of defendant Dr. Marvin Kim, M.D. ("Dr. Kim"). Specifically, Plaintiffs allege that Dr. Kim was negligent in the administration and monitoring of anesthesia, the positioning of McElroy during the surgery, the monitoring of McElroy's blood pressure and vital signs, the provision of proper body fluids to McElroy, and the failure to perform a proper, thorough, and complete pre-anesthetic examination.

Presently before the Court is a motion by Dr. Kim (1) to preclude Plaintiffs from offering the expert testimony of Dr. Kathryn E. McGoldrick, M.D. ("Dr. McGoldrick"), at trial and (2) for summary judgment dismissing the complaint against Dr. Kim, pursuant to Federal Rule of Civil Procedure 56. Also pending before the Court is Dr. Kim's motion to exclude Plaintiffs' expert witness, Mark Dershwitz, M.D., Ph.D. ("Dr. Dershwitz"), from trial on the grounds that his expert disclosure is vague, nonspecific, and uninformative, in addition to its being in violation of this Court's December 4, 2003 Order limiting Plaintiffs' further expert disclosure to the issue of *res ipsa loquitor*.

In his motion for summary judgment, Dr. Kim contends that Dr. McGoldrick's testimony should be excluded and that, if her testimony is in fact excluded, Plaintiffs will be unable to state a prima facie case against Dr. Kim, thereby entitling him to summary judgment dismissing the complaint. For the reasons set forth below, the Court denies both of Dr. Kim's motions.

## II. Discussion

### (a) Expert Testimony Standard

The admissibility of expert and other scientific or technical expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

"[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Amorgianos v. National Railroad Passenger Corporation*, 303 F.3d 256, 265 (2d Cir.2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

"In fulfilling its gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (quoting *Campbell v. Metropolitan Property and Casualty Insurance Company*, 239 F.3d 179, 184 (2d Cir.2001)). Then, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered, making this determination with reference to the indicia of reliability identified in Rule 702, namely (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness

has applied the principles and methods reliably to the facts of the case. *See id.* "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 265–66 (quoting *Kumho Tire Company v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

▇ In addition to the specific criteria set forth by Rule 702, the Supreme Court set out a list of non-exclusive factors that the district court may consider in determining whether an expert's reasoning or methodology is reliable. These factors include: (1) whether the theory or technique on which the expert relies can be and has been tested—that is, whether the expert's theory can be challenged in some objective or empirical sense; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory and the existence and maintenance of standards controlling the technique or theory's operation; and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *See Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. These factors do not constitute a "definitive checklist or test," however, as "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* Thus, "the gatekeeping inquiry must be tied to the facts of a particular case." *Amorgianos,* 303 F.3d at 266 (quoting *Kumho,* 526 U.S. at 150, 119 S.Ct. 1167).

The flexibility of the inquiry is meant to ensure that the district court is given the discretion necessary "to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact."

*Id.* at 267. However, to warrant admissibility, "it is critical that an expert's analysis be reliable at every step," as "the *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 267 (citations and quotations omitted).

▇ Thus, in making its reliability determination, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* If the court finds some flaw in the expert's reasoning, the judge should only exclude the expert's testimony if that flaw is large enough that the expert lacks "good grounds" for his conclusions. *Id.* This tendency toward limiting the exclusion of expert testimony "accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.* As the *Daubert* court explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

### (b) Dr. McGoldrick's Testimony

According to Plaintiffs' disclosure statement, Dr. McGoldrick is expected to testify that McElroy's postoperative vision loss is the result of ischemic optic neuropathy ("ION"). *See* Plaintiffs' Witness Disclosure at 2. She is also expected to testify as to other risk factors for ION, including

large intraoperative blood loss, long duration in the prone position, intraoperative hypotension and anemia, venous congestion, and increased venous pressure that occurs with prolonged head-down positioning or when large quantities of fluid infusion decrease profusion to the optic nerve. *Id.* Finally, she is expected to testify that decreased blood pressure and increased venous pressure can be hazardous and that, in the instant case, the administration of 10,000 cc of crystalloid to McElroy, who purportedly lost only 600 cc of blood, constituted a deviation from the standard of care and resulted in decreased perfusion to his optic nerves, resulting in tunnel vision in his left eye and only light perception in his right eye. *Id.*

Dr. Kim does not challenge Dr. McGoldrick's qualifications as an expert witness in this action. Dr. McGoldrick is a physician duly licensed to practice in the State of New York and has been licensed to practice in New York since 1986. McGoldrick Deposition at 5. From 1976 to 1987, she served as an anesthesiologist at the Massachusetts Eye and Ear Infirmary Massachusetts, and from 1987 until August of 2001 she served as the director of the ambulatory surgery unit at Yale University. *Id.* at 5, 8. Dr. McGoldrick left her position at Yale in August of 2001 to become chairman and director of anesthesiology at New York Medical College, Westchester Medical Center. *Id.* at 5.

Dr. McGoldrick's proposed expert testimony focuses on her theory that the amount of fluid used during McElroy's surgery caused his post-operative vision loss. In order to establish causation, Plaintiffs must offer admissible expert testimony regarding both general and specific causation. *See Amorgianos,* 303 F.3d at 268. In other words, Plaintiffs must establish both (1) that the administration of an amount of fluid disproportionate to a patient's need for replacement fluid can cause ION and (2) that the administration of a disproportionate amount of fluid actually did cause ION in the instant case. Dr. Kim contends that Dr. McGoldrick's testimony to this effect is fatally flawed as to both general and specific causation, and he claims that her testimony should therefore be precluded as unreliable.

Dr. Kim bases his contention primarily on the fact that Dr. McGoldrick's opinion "is not supported by any scientific study, has not received acceptance by any relevant peer review, and had not been accepted by the physicians dealing with this area of medicine." Dr. Kim's Memorandum at 2. More particularly, Dr. Kim contends that "upon examination of the literature in the medical community regarding ION, it is clear that the occurrence of ION is considered rare and that the cause of it is multifactorial, with no one cause specifically documented because of the lack of an adequate number of cases for study and statistical analysis." *Id.* at 4.

Dr. Kim points to a number of articles to support his position. He refers, for instance, to Dr. Steven Roth's "Postoperative Vision Loss, Still No Answers—Yet," published in 2001, in which Dr. Roth describes postoperative vision loss as a multifactorial problem with no consistent underlying mechanism and notes that there is a need for a large epidemiologic study and research at a basic level in order to determine the underlying causes of, and means to prevent, postoperative vision loss. He also cites Dr. Lori Ann Lee's "Postoperative Vision Loss Data Gathered and Analyzed," in which Dr. Lee writes that the etiology of postoperative ischemic operative neuropathy is unclear and that the number of reported cases is too small to draw conclusions. Similarly, Dr. Kim specifies a 1995 article entitled "Postoperative Ischemic Optic Neuropathy," by Drs.

E. Lynne Williams, William M. Hart, Jr., and Rene Tempelhoff, which also describes the etiology of postoperative ION as multifactorial.

In addition to the articles cited in support of his position, Dr. Kim relies on statements made by Dr. McGoldrick during her deposition testimony that Dr. Kim claims demonstrate the unreliability of her theory. The statements relied upon by Dr. Kim are statements by Dr. McGoldrick to the effect that, for instance, "we have a lot of unanswered questions and we need more data [with respect to determining the underlying causes and means to prevent postoperative vision loss]." McGoldrick Deposition at 28–29. Another piece of Dr. McGoldrick's deposition testimony pointed to by Dr. Kim states that there have not been any studies done on animals, which might give some indication regarding the accuracy of her hypothesis that McElroy's postoperative vision loss was related to the overhydration of fluids, as Plaintiffs have alleged. See id. at 69–73. Further, Dr. Kim notes Dr. McGoldrick's testimony that her opinion that the administration of 10,-000 cc's of crystalloid caused McElroy's ION has not been scientifically tested. See id. at 128–29.

■ Having considered these objections by Dr. Kim, the Court finds that Dr. McGoldrick's testimony should not be precluded at trial. With respect to what appears to be the gravamen of Dr. Kim's motion, namely that the bulk of literature in the medical community, and Dr. McGoldrick herself, suggest that the occurrence of ION is rare and multifactorial, the Court is not persuaded that this assertion, even if true, renders Dr. McGoldrick's testimony unreliable. For instance, with respect to Dr. Roth's "Postoperative Vision Loss, Still No Answers—Yet" article, Dr. McGoldrick's deposition testimony indicates that she agrees with some of Dr. Roth's conclusions. In particular, Dr. McGoldrick stated that she agreed with Dr. Roth's conclusion that "large quantities of fluid infusion ... decrease perfusion." [2] See McGoldrick Deposition at 28.

Dr. McGoldrick also went on to state that while she agrees that ION is "a multifactorial disease" and is aware of cases where there seems to be no good explanation for why a particular patient had postoperative visual loss, she does "think [that] in Mr. McElroy's case there are good reasons why he had postoperative visual loss." Id. at 31–32. Moreover, she cited Dr. Roth's article for the proposition that, given that we know what some of the multifactorial causes of ION are, "you could titrate your anesthetic to avoid certain complications or scenarios ... that are known to cause risks." Id. at 31–32. In other words, in her deposition testimony, Dr. McGoldrick interpreted Dr. Roth's article, cited by Dr. Kim as an authoritative source within the medical community, as being supportive of her causation theory.

Additionally, Dr. McGoldrick noted that, as of January 19, 1999, "[s]everal articles that discussed factors that were thought to be contributory to the development of [ION]" were available in the literature [3] and that her theory is "as objective as [it can be] given what is available in that

---

2. As stated later in Dr. McGoldrick's deposition, if perfusion pressure is decreased to an inadequate level, then not enough oxygen will be delivered to the optic nerve. See McGoldrick Deposition at 59. Dr. McGoldrick's causation theory in this particular case is that Dr. Kim's administration of 10,000 cc's of

fluid led to decreased perfusion pressure, which then caused McElroy's ION. Id. at 59.

3. Dr. McGoldrick noted two articles in particular that are supportive of her opinion—the Roth article, from 1997, and an article by Dr. Lynn Williams, written in 1995.

literature." *See* McGoldrick Deposition at 127. However, even if Dr. McGoldrick could point to *no* textual authority for her opinion, the Second Circuit has stated that disputes regarding such matters as the lack of textual authority for an expert's opinion, or faults in the methodology used by an expert in reaching an opinion, "go to the weight, not the admissibility," of the expert's testimony. *McCullock v. H.B. Fuller Company*, 61 F.3d 1038, 1044 (2d Cir.1995). Upon consideration of Dr. McGoldrick's qualifications and upon a careful examination of her deposition testimony, the Court sees no step in her analysis that renders her opinion unreliable and finds that, at the very least, she has "good grounds" for her conclusions, the presence of which suggest that the Court should not exclude her testimony. *Amorgianos*, 303 F.3d at 267. Thus, given Dr. McGoldrick's unchallenged qualification as an expert in this matter, the Court finds that this issue regarding whether the multifactorial nature of ION in general renders it impossible to isolate a particular reason why McElroy developed ION in this case represents precisely the sort of instance in which, as stated by the *Amorgianos* court and discussed above, our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.

Because the Court finds that Dr. McGoldrick should not be precluded from testifying at trial, and because such preclusion was the basis for Dr. Kim's summary judgment motion, that summary judgment motion is denied.

### (c) Dr. Dershwitz's Testimony

As is the case with Dr. McGoldrick, Dr. Kim does not challenge Dr. Dershwitz's qualifications as an expert witness in this case. Dr. Dershwitz has an M.D. and a Ph.D., and is licensed to practice in the State of Maine and the Commonwealth of Massachusetts. Dershwitz Disclosure at 3. He has also been certified by the American Board of Anesthesiology. *Id.* at 3. From 1986 to 2002, he had an appointment at Massachusetts General Hospital as an assistant in anesthesia (1986–90), assistant anesthetist (1990–96), associate anesthetist (1996–2000), and clinical associate in anesthesia (2000–02). *Id.* at 4. Since 2000, Dr. Dershwitz has served as an anesthesiologist at UMass Memorial Medical Center. *Id.* He has had several academic appointments since 1977, and he has authored numerous reports and abstracts on the subject of anesthesiology. *Id.* at 4, 8–16.

Dr. Dershwitz stated in his report (as amended on April 12, 2004) that McElroy's postoperative vision loss was due to ION caused by a prolonged period of decreased delivery of oxygen to the anterior portion of the optic nerve. Dershwitz Disclosure at 1. He wrote that such vision loss is a rare occurrence that would be considered "more likely than not" due to the negligence of Dr. Kim. *Id.* According to Dr. Dershwitz, the factors leading to ION include low arterial blood pressure, high venous blood pressure, low hematocrit, low oxygen saturation, and high intraocular pressure. *Id.* He described the procedure performed by Dr. Kim, in which he gave McElroy approximately 10,000 cc's of intravenous fluids when the surgery only resulted in about 600 cc's of blood loss. *Id.* Dr. Dershwitz concluded that the amount of intravenous fluids administered "likely contributed" to a high venous blood pressure and low postoperative hemocrit, both of which are factors that may contribute to a decrease in oxygen delivery. *Id.* He also noted that other risk factors for ION include prone position, pressure on the face, long duration of surgery, and patient history of smoking. *Id.* at 2. Dr. Dershwitz said that all but the last factor were under the direct control of the physi-

cians, and all of those factors were known to the anesthesiologists prior to the procedure. *Id.* at 2.

Dr. Kim contends that the testimony of Dr. Dershwitz should be excluded at trial because it would exceed the authority granted pursuant to this Court's December 4, 2003 Order restricting further expert disclosure by the Plaintiffs to the issue of *res ipsa loquitor.* Snyder Attorney Affidavit at 2. Dr. Kim argues that Dr. Dershwitz's proposed testimony does not relate to *res ipsa loquitor* as required by the Order, but will instead include testimony regarding general malpractice. Dr. Kim's Memorandum at 4.

█ However, the proposed testimony of Dr. Dershwitz fulfills the requirements for the application of *res ipsa loquitor,* and is therefore within the scope of authority granted by the Order. Three prerequisites must be satisfied for *res ipsa loquitor* to be invoked. The first prerequisite is that the event causing the injury must be of a type that does not ordinarily occur in the absence of negligence. *States v. Lourdes Hosp.* 100 N.Y.2d 208, 210, 762 N.Y.S.2d 1, 792 N.E.2d 151 (2003). Although Dr. Dershwitz does not use that precise language in his report, the prerequisite is satisfied by his assertion that such postoperative vision loss "would be considered by specialists in anesthesiology and perioperative medicine to be, more likely than not, due to the negligence on the part of one or more of his caregivers." Dershwitz Disclosure at 1. He also noted that the approach taken by Dr. Kim was "unconventional." *Id.* Further, Dr. Dershwitz stated that the procedure led Dr. Kim to administer excessive amounts of fluid to McElroy, likely causing high venous blood pressure and low hemocrit, both of which are factors leading to decreased oxygen delivery (the cause of ION). *Id.*

The second prerequisite is that the injury be caused by an agent or instrumentality within the exclusive control of the defendant, and the third is that no act or negligence of the plaintiff contributed to the happening of the event that caused the injury. *States,* 100 N.Y.2d at 212, 762 N.Y.S.2d 1, 792 N.E.2d 151. The proposed testimony of Dr. Dershwitz satisfies both of these requirements. Dr. Dershwitz named five factors (low arterial blood pressure, high venous blood pressure, low hematocrit, low oxygen saturation, and high intraocular pressure) that contribute to a decrease in oxygen delivery causing ION, and each factor was under the control of the physicians. Dershwitz Disclosure at 1. He also identified four risk factors that could contribute to ION, including prone position, pressure on the face, long duration of surgery, and patient history of smoking. The first three risk factors were under the direct control of the physicians, and Dr. Dershwitz does not state that any history of smoking was necessarily a contributing cause in this particular case. Furthermore, with respect to all of the risk factors, the anesthesiologists were aware of the existence of all of the risk factors at the time and proceeded with this particular procedure in the face of them.

█ Dr. Kim further argues that the written report submitted by Dr. Dershwitz is insufficient under Federal Rule of Civil Procedure 26, which requires that an expert's report contain "a complete statement of all opinions to be expressed and the basis and reasons therefor [and] the data or other information considered by the witness in forming the opinions." Dr. Kim claims that Dr. Dershwitz's conclusions are "vague, nonspecific and completely uninformative." Dr. Kim's Memorandum at 3–4. The Court finds, however, that Dr. Dershwitz's report is sufficiently specific under Federal Rule of Civil Proce-

dure 26. In his report, Dr. Dershwitz described the cause of McElroy's postoperative vision loss as being ION. Dershwitz Disclosure at 1. He detailed the cause of ION, as well as the factors that contribute to it. *Id.* He specifically explained the procedure used by the anesthesiologists and how that likely resulted in a high venous blood pressure and low postoperative hemocrit, which are listed in his report as causes of the decreased oxygen flow that leads to ION. *Id.* This information is sufficient to satisfy the requirements of Rule 26.

Because the testimony of Dr. Dershwitz does not exceed the scope required by this Court's December 4, 2003 Order and does not violate Federal Rule of Civil Procedure 26, this Court finds that the testimony of Dr. Dershwitz will not be excluded.

### III. Conclusion

Based on the foregoing discussion, it is hereby

ORDERED, that Dr. Kim's motion for summary judgment (Dkt. No. 51) is **DENIED**; and it is further

ORDERED, that Dr. Kim's motion to preclude Dr. Dershwitz from testifying at trial is **DENIED**; and it is further

ORDERED, that the Clerk serve a copy of this order on all parties.

IT IS SO ORDERED.