Russell DOVER, Henry Horsey, Cody Rank, and Suzette Perry, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**BRITISH AIRWAYS, PLC (UK), Defendant.**

**12 CV 5567 (RJD) (CLP)**

United States District Court, E.D. New York.

Signed 06/05/2017

Clive Zietman, Stewarts Law, LLP, London, for Plaintiffs.

Richard Francis Hans, DLA Piper LLP (US), New York, NY, for Defendant.

## MEMORANDUM OF DECISION

DEARIE, District Judge

On May 16, 2017, the Court ruled as follows:

> The parties in this hotly contested class action have traded motions to exclude the opposing party's proposed expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Federal Rule of Evidence 702. Although the motions identify potentially legitimate areas of cross-examination, all but one, the motion to strike Dr. Andrew Hildreth's report and to exclude his proposed testimony, are denied. The Court concludes that an evidentiary hearing is warranted to consider more fully the admissibility of Dr. Hildreth's testimony. A Memorandum of Decision will follow."

For the purposes of this Memorandum of Decision, the Court assumes familiarity with the facts. See ECF No. 249 ("Class Cert. Order"), at 1–3.

## LEGAL STANDARD

■ Under Federal Rule of Evidence 702, a witness with "scientific, technical, or other specialized knowledge [that] will help the trier of fact" may offer expert testimony so long as that testimony is "based on sufficient facts or data," and is the product of "reliable principles and methods" "reliably applied ... to the facts of the case." See Fed. R. Evid. 702(a)–(d). "The proponent of the expert testimony has the burden [of] establish[ing] these admissibility requirements...." In re Pfizer Inc. Secs. Litig., 819 F.3d 642, 658 (2d Cir. 2016).

■ Under Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court must act as the "gatekeeper" to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167; Daubert, 509 U.S. at 589, 113 S.Ct. 2786. Daubert enumerates a non-exhaustive list of factors the Court considers in discharging that duty: "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005) (citing Daubert, 509 U.S. at 593–94, 113 S.Ct. 2786). "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (citing Daubert, 509 U.S. at 595, 113 S.Ct. 2786).

■ If an expert opinion is based on "data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 man-

date the exclusion of that unreliable opinion testimony." Id. (citation omitted). "Courts, though, must not determine the credibility of the expert's proffered testimony ...." Reed Constr. Data. Inc. v. McGraw–Hill Cos., Inc., 49 F.Supp.3d 385, 399 (S.D.N.Y. 2014) (emphasis added). Indeed, "the possibility of mistake need only be tolerable, not remote. Within that tolerable range, disputes over competing expert opinions are to be resolved by the trier of fact. Outside it, courts exclude the testimony." Id.

### ANALYSIS

#### A. Plaintiffs' Experts

##### 1. Robert Kokonis

During Robert Kokonis's 25 years in the airline industry, he held management positions with several airlines where he was responsible for, among other things, budgeting and forecasting fuel expenses. Today he is president and managing director of an advisory firm, Air Trav, which advises airlines and other clients on "commercial, financial, frequent flyer, fleet fuel efficiency, fuel procurement..., revenue management, and risk management issues." ECF No. 186–6 ("Kokonis May Report"), at 3. In his report and testimony, Kokonis opines that British Airways used its fuel surcharges, referred to internally as YQ charges, as a means of maximizing its revenues rather than recovering unanticipated fuel costs. He also asserts that it would have been feasible for British Airways either to operate without using a fuel surcharge, accounting for fluctuations in the fuel markets through fare adjustments alone, or to impose a fuel surcharge calculated automatically and directly related to the cost of fuel.

■ In moving to exclude these opinions, British Airways first argues that Kokonis is unqualified because he has not previously testified an expert witness, lacks industry-specific certifications and education, and has never worked on an airline's frequent flyer, fuel surcharge, or revenue management programs. Kokonis's airline industry experience, however, plainly qualifies him to offer expert opinions in this case. The supposed gaps in Kokonis's experience noted by British Airway may be addressed on cross-examination but do not render the opinions inadmissible. See In re Zyprexa Prods. Liab. Litig., 489 F.Supp.2d 230, 282 (E.D.N.Y. 2007) ("Assertions that the witness lacks particular educational or other experiential background 'go to the weight, not the admissibility, of [the] testimony.'") (alteration in original) (quoting McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995)).

■ British Airways next argues that Kokonis's testimony is somehow irrelevant and unreliable. The Court disagrees. The central questions in this case are whether British Airways breached the Contract, and if so, whether and to what extent Plaintiffs were damaged. Kokonis's proffered opinions plainly bear on those questions. See generally Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). For example, if Kokonis is right and British Airways used its YQ charge to maximize revenues, not to defray unexpected fuel costs, then that is relevant to whether the YQ charge was, in fact, a "supplemental charge that is reasonably related to or based upon the cost or price of fuel." See ECF No. 52 ("MTD Order"), at 9 (defining "fuel surcharge" for purpose of British Airways' Rule 12(b)(6) motion). Kokonis's testimony that it would have been feasible for British Airways to operate without a fuel surcharge at all or to impose a surcharge directly tied to the cost of fuel is similarly relevant.

The reliability objection is likewise a non-starter. Kokonis's opinions rest on a reliable foundation, namely his knowledge and experience along with the data and testimony produced by British Airways. Most of British Airways' reliability arguments go to the correctness of Kokonis's conclusion that the airline's YQ charges exceeded its fuel costs on certain routes, not the reliability of the methods he used in reaching that conclusion. See Amorgianos, 303 F.3d at 266 (noting that "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."). The supposed flaws that British Airways does identify in Kokonis's methods—that it was not flying some of the routes he analyzed during the relevant period, or was using different aircraft than his analysis assumes—may be appropriate for cross-examination, but they are not so " 'large . . . that [he] lacks 'good grounds' for his conclusions.' " Id. at 267 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 746 (3d Cir. 1994) (Becker, J.)).

Finally, British Airways argues that Kokonis's testimony would be cumulative of the deposition testimony of the airline's witnesses and, because he characterizes that testimony as inconsistent, would usurp the role of the jury. Neither argument, however, raises genuine admissibility concerns. The cumulativeness complaint is misplaced because the testimony of British Airways' witnesses provides appropriate foundation for the opinions Kokonis formed about the airline's YQ charges. The province of the jury will be adequately protected, should this case go to trial, by limiting the testimony of Kokonis and all other witnesses[1] to matters about which they are competent. See R.F.M.A.S., Inc. v. So, 748 F.Supp.2d 244, 268 (S.D.N.Y. 2010) ("Determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony.").

### 2. Jonathan Arnold

Econometrics witness Jonathan Arnold, an economist who works for the Chicago Economics Corporation and Compass Lexecon, prepared three reports for use in this case: one dated May 4, 2015, ECF No. 183–12 ("Arnold May Report"), a second, dated July 15, 2015, ECF No. 183–14 ("Arnold July Report"), and a third, dated September 14, 2015, ECF No. 183–15 ("Arnold Sept. Report"). In these reports Arnold asserts: (1) that the YQ charges do not bear a "close relationship" to the airline's fuel costs and were not "as a matter of economics" fuel surcharges at all, (2) that British Airways used an irrelevant figure, its cost of fuel in 2003–2004, as a baseline in setting the YQ charge over time, (3) that these actions resulted in economic harm to the members of the class, and (4) that damages to the class under several alternative assumptions vary from $143 million to $161 million.

British Airways argues that Arnold's proposed testimony is irrelevant principally because the Contract does not expressly require that fuel surcharges be determined "as a matter of economics." This argument can be dispensed with quickly. Arnold's opinion that the YQ charges are not fuel surcharges as a matter of economics " 'tend[s] to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable . . . ,' " namely whether British Airways breached the Contract. See Amorgianos, 303 F.3d at 265 (quoting Fed. R. Evid.

---

1. Plaintiffs reprise this argument in moving to exclude the testimony of British Airways' experts Daniel Kasper and Marc Sherman. As with Kokonis's testimony, this is not sufficient grounds for excluding their testimony, which will be appropriately limited at trial.

401). Arnold's explanation of general economic principles bearing on pricing and surcharges, and the circumstances under which surcharges are commonly used, are similarly relevant. See Arnold May Report ¶¶ 11–17. Unquestionably, this proposed testimony would "assist the trier of fact to understand the evidence ..." presented about British Airways's reasons for imposing the YQ charge and the factors it considered in setting and adjusting that charge. See Fed. R. Evid. 702(a).

■ British Airways next makes separate challenges to the reliability of the methods underlying each of Arnold's three principal points: the "no close relationship" and "matter of economics" opinions and his damages models.

With respect to Arnold's view that the YQ charges and actual fuel prices lack a "close relationship," British Airways says the opinion is unreliable because it is not based on a regression or some other method endorsed by peer-reviewed or published studies. Arnold's election not to use a regression, however, is not fatal. See Kumho Tire, 526 U.S. at 141, 119 S.Ct. 1167 (noting that "the test of reliability is 'flexible' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."); Schanzer v. United Tech. Corp., 120 F.Supp.2d 200, 206 (D. Conn. 2000) (stating that a regression is not necessary "in every case in which statistical evidence forms some part of the proof...."). Arnold's methodology, a quarter-by-quarter comparison of British Airways' YQ charge and fuel prices and a comparison of the relative growth of the YQ charge and fuel prices, is at a minimum a reasonable and sufficiently reliable method of assessing the relationship between the YQ charge and fuel prices. See Zeraga Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213–14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). Any arguable weakness in this methodology, or the possiblity that relevant factors were omitted, goes to weight, not admissibility. See id. at 214 ("'[C]ontentions that the assumptions [of an expert witness] are unfounded go to the weight, not the admissibility, of the testimony.'" (alteration omitted) (quoting Boucher, 73 F.3d at 21)).

Second, British Airways argues that Arnold's "matter of economics" opinion is unreliable because he does not provide citations for the basic economic principles on which he relies. This trivial objection, however, is another that goes to weight rather than admissibilty. See McCullock, 61 F.3d at 1044 (the "lack of textual authority for his opinion[ ] go[es] to the weight, not admissibility, of his testimony"); see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 129 (S.D.N.Y. 2014) (rejecting a challenge to an expert witness's testimony that was based on "general knowledge of economic principles ... and his application of that understanding to the specific facts of the ... case ...."). The same is true of Arnold's view that it was inappropriate as a matter of economics for the airline to use its 2003–2004 fuel costs as a baseline when setting its YQ charges. Even if textual support for that view was necessary, his September report notes that a paper cited by two of British Airways' experts supports his view. See Arnold Sept. Report ¶ 27 (citing Richard Klophaus, Airline Fuel Surchages: Theory and Practice, at 5–6 (2012)).

Third, British Airways challenges the reliability of Arnold's damages models. Under English law, which governs this

case, "the object of compensatory damages for breach of contract is, as far as money can do it, to put the claimant in the position it would have been in had the contract been performed." See ECF No. 168–24 ("Crane Reply Report"), ¶ 83. Assuming that British Airways breached the Contract, the parties' experts agree that under English law, the amount of damages to the class would equal the difference between the amount class members paid in YQ charges and the amount they would have paid had British Airways adopted an alternative, commercially reasonable course of conduct in compliance with the Contract. See id. ¶ 86; ECF No. 207–3 ("Sutcliffe Reply Report"), ¶¶ 68–69; see also Arnold May Report ¶ 56 (discussing consequential damages and noting that "under English law, this standard bases damages on alternative, commercially reasonable conduct that would not have breached the contract."). Thus, to calculate damages, the fact-finder must consider commercially reasonable alternatives to the YQ charges British Airways imposed.

This is exactly what Arnold did. As discussed, he proposes two basic alternatives: that British Airways could have operated without any fuel surcharge, or that it could have implemented a fuel surcharge, adjusted on a quarterly basis, that was more directly related to the cost or price of fuel. British Airways argues that these proposals are inadmissible because they lack foundation or are unrealistic and speculative. Kokonis, however offers a basis for Arnold's view. See Kokonis May Report ¶ 42, (stating, based on his experience in the airline industry, that "it is not commercially unreasonable to manage fuel costs without a YQ charge."); see also id. at ¶ 8 (explaining that he prepared this opinion in response to a question from Arnold). British Airways also challenges as speculative Arnold's assumption, for the purposes of calculating damages, that the airline could have reset its fuel surcharge quarterly. This objection alone is not grounds for excluding his testimony. See Zeraga, 571 F.3d at 214 (explaining that exclusion is warranted "where an expert's opinion is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith ....'" (quoting Boucher, 73 F.3d at 21)). The same is true of the complaint that Arnold's damages models are based on an unrealistic ex post view that the airline could not have attained in reality: this is an argument for the jury to assess with the aid of cross-examination and the presentation of contrary evidence.[2] See Daubert, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)). In short, the suggestion that the

---

**2.** British Airways also argues that Arnold's damages calculations are unreliable because some of his alternatives yield a small percentage of the class with negative damages. But it is not clear what this argument has to do with whether Arnold's testimony is "based on sufficient facts or data" or "the product of reliable principles and methods ...." See Fed. R. Evid. 702(b)-(c): see also In re Fosamax Prods. Liab. Litig., 645 F.Supp.2d 164, 173–74 (S.D.N.Y. 2009) ("The Daubert analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions."). In any event, this argument is unconvincing: even though a small number of class members may not have been injured depending on the method of calculating damages adopted by the finder of fact, that is not enough to preclude class certification, let alone compel the exclusion of expert testimony. See In re Nexium Antitrust Litig., 777 F.3d 9, 21–22 (1st Cir. 2015) ("[I]t is difficult to understand why the presence of uninjured class members at the preliminary stage should defeat class certification. Ultimately, the defendants will not pay, and the class members will not recover, amounts attributable to uninjured class members ....")

assumptions underlying Arnold's damages calculations are unfounded, like nearly all the objections raised in the parties' cross-motions, " 'go to the weight, not the admissibility, of [his] testimony.' " Zeraga, 571 F.3d at 214.

## B.   British Airways' Experts

### 1.   Daniel Kasper & Marc Sherman

Returning British Airways' favor, Plaintiffs move to exclude the testimony of Daniel Kasper on the grounds that he did not prepare his report. In the alternative, Plaintiffs move to exclude parts of the testimony of Kasper and another British Airways expert, Marc Sherman, because it is irrelevant and outside the scope of proper rebuttal testimony.

Plaintiffs' first argument, that Kasper did not prepare his report, strains credulity. Kasper testified at his deposition that he prepared the report, and the Court cannot infer that the report is not the product of his own research and analysis simply because he spent less time preparing the report than other experts in this case. See, e.g., O'Hara v. Travelers, No. 2:11-CV-208-KS-MTP, 2012 WL 3062300, at *9 (S.D. Miss. July 26, 2012) (precluding expert testimony where "[the witness] testified that he did not prepare or assist in the preparation of the expert reports . . . ."); In re Jackson Nat'l Life Ins. Co. Premium Litig., No. 596MD1122, 1999 WL 33510008, at *1 (W.D. Mich. Sept. 29, 1999) (striking the testimony of a witness who testified untruthfully about the authorship of his report, which was not, in fact, prepared by him).

■ Plaintiffs' concerns about relevance and the proper scope of rebuttal testimony are misplaced as well. Kasper's and Sherman's comparison of British Airways' YQ charge with other airlines' fuel surcharges and discussion of the economic challenges facing the airline industry generally are relevant and within the proper scope of rebuttal because they: (1) respond to Kokonis's and Arnold's testimony regarding damages and commercially reasonable alternatives to the YQ charges that British Airways might otherwise have pursued, and (2) bear on the relationship between the YQ charges and fuel prices. See S.W. v. City of New York, No. CV 2009-1777 (ENV) (MDG), 2011 WL 3038776, at *2 (E.D.N.Y. July 25, 2011) ("Rebuttal evidence is properly admissible when it will explain, repel, counteract, or disprove the evidence of the adverse party." (quoting Crowley v. Chait, 322 F.Supp.2d 530, 551 (D.N.J. 2004))).

### 2.   Andrew Hildreth

■ Plaintiffs also challenge the report and testimony of Andrew Hildreth, an econometrician retained by British Airways. They contend that several regressions Hildreth ran, regressions he claims show a "high degree of correlation (over 70 percent)" between the price of fuel and British Airways' YQ charges, are afflicted by a fundamental error that renders their results "spurious," that is meaningless as a matter of statistics. See Clive Granger & Peter Newbold, Spurious Regressions in Econometrics, 2 J. Econometrics 111, 112–14 (1974) (explaining the phenomenon of "spurious" regressions in time series data, that is regressions that may show a false correlation between unrelated variables).

Regressions are, of course, an accepted and generally reliable form of econometric and statistical analysis, regularly admitted in court. See Reed, 49 F.Supp.3d at 399–401 (reviewing types of cases in which the results of regressions are typically admitted and identifying some common methodological flaws). The parties' primary econometric experts, Hildreth and Arnold, agree that an otherwise properly run regression may yield spurious results if, among other things, the analysis fails to

account for the "non-stationarity" of underlying data. See Arnold Sept. Report, ¶ 12; ECF No. 182–4 ("Hildreth Decl."), ¶ 16. Data is non-stationary if its statistical properties, such as mean, vary over time. Arnold Sept. Report ¶ 11 & n.21; Hildreth Decl. ¶ 14 (explaining that for a non-stationary series, "[p]arameters such as the mean and variance do not change over time and do not follow any trends."). Colloquially, non-stationary data is said to exhibit a "random walk," such that knowing its value today tells us little or nothing about its value tomorrow. See Arnold Sept. Report ¶¶ 11–12 & n.22. Importantly, Hildreth and Arnold also agree that the data analyzed by Hildreth, fuel prices and British Airways' YQ charges throughout the class period, are non-stationary. See Arnold Sept. Report ¶ 17; Hildreth Decl. ¶ 18.

In his supplemental expert report, Plaintiffs' expert, Arnold, argues that the results of Hildreth's regressions are unreliable because they fail to properly account for the non-stationarity of the underlying data. Arnold used one method for transforming non-stationary data into stationary data, using the "first differences" of the data, "that is . . . the period-to-period changes in the data series." Arnold Sept. Report ¶ 19. Performing regressions on the first-differenced YQ charge and fuel price data, Arnold concludes that Hildreth's regressions (and, as a result, the conclusions he draws from them) are spurious. Id. ¶ 20.

Hildreth, in a declaration submitted in response to Arnold's critique, ripostes that first-differencing the YQ charge and fuel price data is not the only way of performing reliable regressions on non-stationary data. He maintains that non-stationary data may still be appropriately used in a regression analysis if the data is "cointegrated." See Hildreth Decl. ¶¶ 19–21 & n.2 (citing Robert Engle & Clive Granger, Cointegration and Error Correction: Representations, Estimation and Testing, 55 Econometrica 251 (1987)). Data is cointegrated if, despite its non-stationarity, there is a long-run equilibrium between the two variables. See generally Michael P. Murray, A Drunk and Her Dog: An Illustration of Cointegration and Error Correction, 48 Am. Statistician 37, 37–39 (1994) (analogizing cointegrated variables to the walks of a drunk woman wandering in search of her puppy). In his declaration, Hildreth states that he "tested for cointegration using the standard method as described by Engle and Granger's published work released in 1987." Hildreth Decl. ¶ 21 (emphasis in original). Hildreth claims that these tests revealed that all the relevant data are cointegrated, and based on this conclusion, Hildreth reiterates his view that British Airways' YQ charges were highly correlated with fuel prices.

In response to this final salvo from Hildreth, Plaintiffs attached to their reply a declaration from Robert Engle, the Nobel Prize-winning economist behind the Engle–Granger test,[3] the "standard method" for testing for cointegration that Hildreth claims to have used in his analysis. See Hildreth Decl. ¶ 21; see also ECF No. 182–1 ("Engle Decl."). Engle does not, however, agree with Hildreth's conclusion that the YQ charge and fuel prices are cointegrated. Indeed, Engle states that

---

**3.** British Airways filed two motions for sanctions stemming from the alleged eleventh-hour disclosure of Engle's retention and his declaration. See ECF Nos. 202, 216. But the specifics of Hildreth's analysis, in particular his reliance on Engle's method for testing for cointegration, were not clear to Plaintiffs until November 6, 2015, when Hildreth submitted his declaration elaborating on the methods he used in preparing his report. Engle's response was as timely as could reasonably be expected—he submitted his declaration just ten days later, on November 16, 2015. As a result, the motions for sanctions are denied.

Hildreth did not even perform the Engle–Granger test. Rather, Engle asserts that Hildreth performed a related, but different test "which cannot be used to show cointegration." Engle Decl. ¶ 7, 14. Performing his test on the data Hildreth used, Engle concludes that "none of the YQ series analyzed by Dr. Hildreth are cointegrated with fuel prices." Id. ¶ 8. As a result, Engle agrees with Arnold that the results of Hildreth's regression are spurious and statistically meaningless.

Unlike the parties' arguments respecting the other experts, the possibility that Hildreth's analysis may be spurious and statistically meaningless goes to the heart of the Supreme Court's concerns in Daubert and Kumho Tire. See Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167 (stating that a trial court's gatekeeping role requires ensuring that "an expert... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). The line between what is unsound science and admissible but impeachable testimony is oftentimes difficult to identify, but if Arnold and Engle are correct that the underlying data Hildreth used is non-stationary and not cointegrated, then Hildreth's analysis may be so "flaw[ed]... that [he] lacks 'good grounds' for his ... conclusions." See Amorgianos, 303 F.3d at 267 (quoting Paoli, 35 F.3d at 746); see also id. ("In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.").

The Court will not decide, however, whether Hildreth's testimony is admissible based solely on the parties' submissions. Given the complexity of the issues presented in the parties' submissions and the duty of the Court to discharge its gatekeeping function, an evidentiary hearing is warranted to consider more fully the admissibility of Hildreth's testimony and to hear him and British Airways respond to the forceful critiques Engle and Arnold level against his analysis. See Fed. R. Evid. 104(c) (authorizing such hearings). Although such a hearing is not necessarily required, the Second Circuit has stated they are "highly desirable to enable the parties to present expert evidence and to test credibility through cross examination." Borawick v. Shay, 68 F.3d 597, 608 (2d Cir. 1995). In addition, such hearings are commonly held in cases like this one that involve expert testimony on complex scientific or economic topics. See, e.g., Reed, 49 F.Supp.3d at 396–407 (reviewing, after an evidentiary hearing, expert testimony regarding regression analysis and other economic testimony). At the hearing, which will be held on a mutually agreeable date and time or when ordered by the Court, the parties and their experts should be prepared to address the issue of cointegration and how to conduct a meaningful regression based on non-stationary data.

### CONCLUSION

The motions to exclude the testimony of Robert Kokonis, Jonathan Arnold, Daniel Kasper, and Marc Sherman are denied. The Court defers ruling on the motion to exclude the testimony of Andrew Hildreth pending an evidentiary hearing.

SO ORDERED: