**Clark SEELEY and Jannine Walton, Plaintiffs,**

v.

**HAMILTON BEACH/PROCTOR–SILEX, INC., Defendant.**

No. 1:99–CV–1162.

United States District Court, N.D. New York.

Dec. 15, 2004.

---

382

Jeffrey N. Miller, Friedman, Hirschen Law Firm, Schenectady, NY, William D. Pastorick, Cozen, O'Connor Law Firm, Philadelphia, PA, Robert Ruslander, Office of Robert Ruslander, Delmar, NY, Robert J. Rock, Office of Robert J. Rock, Albany, NY, for Plaintiffs.

Kyle N. Kordich, Thorn, Gershon Law Firm, Albany, NY, for Defendant.

## MEMORANDUM–DECISION AND ORDER [1]

KAHN, District Judge.

### I. Background

On June 1, 1998, Plaintiff Clark Seeley ("Seeley") was at his home heating Pop–Tarts® in his toaster, which was designed, manufactured, and distributed by Defendant Hamilton Beach/Proctor–Silex, Inc. ("Hamilton Beach"). Hamilton Beach Attorney Aff. (Dkt. No. 17) at ¶ 9. Seeley then left the residence while the Pop–Tarts® were still heating in the toaster. *Id.* After Seeley left, the toaster allegedly malfunctioned, causing a fire in the kitchen. Complaint (99–cv–1750 Dkt. No. 1) at ¶ 8.[2] The fire spread to the rest of the house, which resulted in extensive damage. *Id.* at ¶ 9. Seeley and Plaintiff Jannine Walton (collectively, "Plaintiffs") filed a claim with their insurance company, Liberty Mutual, which paid them approximately $145,000 pursuant to the terms of their policy. *Id.* at ¶ 11. Plaintiffs, however, estimate the damage from the fire to be over $245,000. *Id.* at ¶ 10. Plaintiffs filed the instant suit against Hamilton Beach to recover damages for which they were not

1. For printed publication in the Federal Reporter.

2. Initially, this case was two separate actions, 99–cv–1162 filed by Liberty Mutual and 99–cv–1750 filed by Plaintiffs. The case was later consolidated into this one action. Documents filed in 99–cv–1750 before consolidation will be referenced as 99–cv–1750 Dkt. No. ___.

compensated by their insurance company based upon theories of negligence, strict products liability, and breach of warranties with respect to their Hamilton Beach toaster that allegedly caused the fire.[3] *Id.* at ¶¶ 15, 18, 28. Currently before the Court is Hamilton Beach's motion seeking to preclude the testimony of the Plaintiffs' proposed expert witness, Michael Wald ("Wald"), pursuant to Federal Rule of Evidence ("FRE") 702.

## II. Discussion

### A. Expert Testimony

#### 1. Standard

 The admissibility of expert and other scientific or technical expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. "[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow*

*Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). This duty is equally applicable to expert testimony based upon engineering principles. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

 "In fulfilling its gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos,* 303 F.3d at 265 (quoting *Campbell v. Metro. Prop. and Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir.2001)). Then, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered, making this determination with reference to the indicia of reliability identified in Rule 702, namely (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. *See id.* "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 265–66 (quoting *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167).

 In addition to the specific criteria set forth by Rule 702, the Supreme Court set out a list of non-exclusive factors that

---

**3.** Liberty Mutual also filed suit against Hamilton Beach for indemnification. Liberty Mutual Complaint (Dkt. No. 1). Liberty Mutual and Hamilton Beach have since stipulated that those claims be dismissed. Stipulation (Dkt. No. 31).

the district court may consider in determining whether an expert's reasoning or methodology is reliable. These factors include: (1) whether the theory or technique on which the expert relies can be and has been tested—that is, whether the expert's theory can be challenged in some objective or empirical sense; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory and the existence and maintenance of standards controlling the technique or theory's operation; and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *See Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. These factors do not constitute a "definitive checklist or test," however, as "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* The flexibility of Rule 702 has been specifically recognized regarding expert engineering testimony. *Kumho,* 526 U.S. at 150, 119 S.Ct. 1167. For example, the Supreme Court noted that the reliability of expert engineering testimony in one case may depend heavily upon the underlying scientific foundation, while in another may depend primarily upon personal knowledge or experience. *Id.* Thus, "the gatekeeping inquiry must be tied to the facts of a particular case." *Amorgianos,* 303 F.3d at 266 (quoting *Kumho,* 526 U.S. at 150, 119 S.Ct. 1167).

 The flexibility of the inquiry is meant to ensure that the district court is given the discretion necessary "to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Id.* at 267. Thus, in making its reliability determination, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* If the court finds some flaw in the expert's reasoning, the judge should only exclude the expert's testimony if that flaw is large enough that the expert lacks "good grounds" for his conclusions. *Id.* This tendency toward limiting the exclusion of expert testimony "accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.* As the *Daubert* court explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

## 2. Wald's Testimony

According to Wald's report, he will testify that an examination of the toaster and surrounding items indicated that there was abnormal electrical activity in the interior of the toaster, causing a fire inside the unit while it was operating. Wald's Report (Dkt. No. 17, Ex. H) at 1. He will explain that ending the toasting cycle requires the horizontal movement of a rod across the bottom of a toasting chamber and through a small cutout in the front of the toaster frame. *Id.* When the toaster reaches a certain temperature, a bi-metal strip bends in response, causing this horizontal movement of the bar. *Id.* The bar must move far enough to push switch contacts closed, which causes the toast cycle to end. *Id.* Wald will testify that in order for the rod to move through the cutout, it must be free of debris that may drip down on it from the toasting chamber above. *Id.*

Wald will testify that he performed a series of experiments in which he put Pop

Tarts® and other toaster pastries in the toaster at different settings, and put sugar pastry frosting directly on the rod. Wald's Deposition (Dkt. No. 27) at 54–55; Wald's Report (Dkt. No. 17, Ex. H) at 1. He asserts that frosting can drip on the rod during normal use, and that movement of the rod through the cutout could be impeded enough that a Pop Tart® would ignite before the toast cycle would end. Wald's Report (Dkt. No. 17, Ex. H) at 1. Wald will testify that the design of the toaster, by having an unprotected rod below a toasting chamber that could collect fallen debris from above and which must fit through a small cutout to end the toast cycle, "presents the direct opportunity for a fire to occur under normally expected operating procedures." *Id.* at 2. Wald is expected to testify that this makes the design defective. *Id.* Further, previous Hamilton Beach designs did not have an unprotected rod, and no other manufacturer of which Wald is aware has such an unprotected rod. *Id.* He will testify that there are safer alternative designs about which Hamilton Beach had knowledge. *Id.*

Hamilton Beach asserts that Wald's testimony does not meet the requirements of Rule 702 because his methodology and reasoning are inherently unreliable and not scientifically valid. Hamilton Beach Memo. (Dkt. No. 18) at 4. Hamilton Beach first claims that by forcibly creating a situation by putting frosting on the rod to meet his theory of what occurred, Wald has not performed sufficient tests, and he is not basing his conclusion on any scientific principle. *Id.* at 6. Further, Hamilton Beach states that Wald's opinions are based upon assumed facts that are not in evidence. *Id.* at 7.

■ As noted above, the *Daubert* test is a flexible one, and not all of the enumerated factors are equally relevant to every type of expert testimony. The testimony of an expert can be reliable while not satisfying each factor. In this case, the testing that was performed by Wald was so specific to this situation that it is not reasonable to require that it have been subject to peer review, have a known or potential rate or error, or have general acceptance within the scientific community. Wald's opinions are, however, capable of being tested. Even though Wald's testimony does not satisfy every *Daubert* factor, a thorough review of Wald's methods, reasoning, and conclusions shows that he has "good grounds" for his conclusions that will assist the trier of fact. *See e.g. Amorgianos,* 303 F.3d at 267.

Wald performed a variety of tests that are appropriate to this litigation, and his opinions "are supported by rational explanations which reasonable men might accept, and none of his methods strike the court as novel or extreme." *Lappe v. Am. Honda Motor Co., Inc.,* 857 F.Supp. 222, 228 (N.D.N.Y.1994) (Hurd, J.). Wald performed dozens of tests involving Hamilton Beach toasters containing the same rod mechanism as Plaintiffs' toaster. Wald's Deposition (Dkt. No. 27) at 27.

One of his tests consisted of placing Pop Tarts® and other toaster pastries in toasters and having them go through toasting cycles. *Id.* at 54–55. He did this approximately fifteen to twenty times. *Id.* at 28. After various cycles, he reported seeing frosting on various components inside the toaster, including the rod. *Id.* at 55. In his tests, he placed the Pop Tarts® and pastries lengthwise and horizontally, and used many different heat settings. *Id.* at 55–56. The second type of test he did involved placing melted sugar frosting and sugar crystals directly on the rod, which impeded the movement of the rod. *Id.* at 61. He did this about twelve times. *Id.* at 78. Although he cannot say with certainty the amount of frosting or sugar crystals he

used in each experiment, the lack of precise measurements does not render his testimony inadmissible. *See Lappe,* 857 F.Supp. at 228. Wald stated that he caused fires in three of the tests in which he impeded the mechanisms of the toaster. Wald's Deposition (Dkt. No. 27) at 27–28. That these particular tests may not have been performed prior to this litigation or faced scrutiny by other engineering experts does not make Wald's testimony insufficient under Rule 702. The methods used and conclusions drawn therefrom are reliable.

■■■ The assertion that Wald's testimony should be precluded because he assumed facts is similarly unsupported. Wald examined the precise toaster that was involved in the fire, and examined other similar toasters. *Id.* at 32–33. Wald did not review schematics for the toaster because it was such a simple device, he did not deem it necessary. *Id.* at 46. He also reviewed reports prepared by Douglas Peterson Associates and the Albany Fire Department. *Id.* at 39. Hamilton Beach notes that Wald did not see the amount of sugar frosting on the rod in the actual toaster, and thus is assuming facts not in evidence. Hamilton Beach Attorney Affidavit (Dkt. No. 17) at 21. However, as the toaster itself caught fire, it is reasonable to presume that any frosting would have been destroyed in the fire. Rule 702 will not be interpreted as establishing an impossible standard to meet.

■■■ Hamilton Beach also points out that Wald did not speak with Plaintiffs to find out, for example, how often they cleaned the toaster. Hamilton Beach Memo. (Dkt. No. 18) at 9. However, in his deposition, Wald said that was irrelevant because they could not have cleaned the rod. Wald Deposition (Dkt. No. 27) at 77. Though Wald did not speak to the family about their prior use of the toaster, he did know that the toaster was used for heating Pop Tarts®. *Id.* Considering the totality of the evidence reviewed by Wald, that he may not have spoken to Plaintiffs to obtain specific information on their use of the toaster will not be sufficient to preclude his testimony. Wald's testimony is reliable and any weaknesses with his methods or conclusions may be exposed through cross-examination.

Finally, Hamilton Beach's assertion that Wald did tests to fit his preconceived theory of the case is not consistent with his deposition testimony. At first, Wald was unsure whether the fire resulted from the toaster, a coffee maker, a microwave oven, or an electrical outlet. *Id.* at 34, 44. After performing an evidence examination, he determined that it was some kind of design defect in the toaster that caused the fire. *Id.* at 33–34, 44–45. However, it was not until after performing the tests that Wald determined precisely what the defect was. *Id.* at 45. There is no evidence that these tests were performed in response to an opinion that Wald previously formulated.

## B. Qualifications

■■■ Pursuant to Rule 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education" in the relevant field to render expert testimony, and may not testify beyond the scope of his or her expertise. Fed. R.Evid. 702.

Wald received a Bachelor of Science degree, with a double major in electrical engineering and pre-medical, from Cornell University in 1977. Wald Curriculum Vitae (Dkt. No. 17, Ex. I) at 1. In 1982, he received his Master of Science degree in electrical engineering with a major in medical engineering and a minor in computer science from George Washington University. *Id.* Since 1977, Wald has served in a

number of engineering positions. From 1990 to 1995, Wald was the Senior Engineer and Department Director for FTI Corporation, which involved "investigation of engineering incidents relating to fires, explosions, personal injuries, medical device failures, property damage, equipment malfunctions, and insurance claim evaluations." *Id.* Since 1995, Wald has been an electrical engineering consultant, consulting "on the cause and origin of electrical equipment malfunctions and failures, fire and explosion investigations, [and] personal injuries involving electrical equipment." *Id.* From 1999 and continuing to the present, Wald has been the President and Principal Engineer of Investigative Engineering, Inc., a forensic engineering and computer graphics services company. *Id.* In this capacity, among other duties, he performs engineering investigations. *Id.* Wald claims to specialize in the investigation of fires and explosions and electrical equipment failures, specifically in the causes of electrical fires. *Id.* He has performed several hundred investigations "involving consumer products, wiring and cabling, medical devices, and residential, commercial, and industrial electrical equipment." *Id.*

▮ Hamilton Beach objects to the qualification of Wald, asserting that he would be testifying outside of the scope of his expertise because he has never been involved in the manufacture or design of toasters. Hamilton Beach Memo. (Dkt. No. 18) at 10. However, there is no requirement that an expert have manufacturing or design experience with a particular device to qualify as an expert about the design of that device. *See, e.g., DaSilva v. Am. Brands, Inc.,* 845 F.2d 356, 361 (1st Cir.1988) (holding that it was not an abuse of discretion for district court to allow a mechanical engineer to give expert testimony about a machine with which the en-

gineer had no design experience). Wald's education and experience in electrical engineering and his experience determining the causes of electrical fires and mechanical malfunctions is sufficient foundation for him to testify as to the design of the toaster which may have resulted in a fire. Furthermore, although he has no toaster manufacturing experience, Wald does have experience analyzing this particular type of toaster. He has dismantled and inspected this type of toaster several times. Wald Deposition (Dkt. No. 27) at 24. He has also read articles about Pop Tarts® causing toaster fires. *Id.* at 25. Although Wald's lack of specific experience with toaster manufacture and design is relevant, his overall education and experience is more than adequate to permit him to testify as an expert in this case. *See, e.g., Lappe,* 857 F.Supp. at 226–27 ("[w]here an expert has the education or background to permit him to analyze a given set of circumstances, he can through readings, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture") (internal quotations and citations omitted).

## III. Conclusion

Based on the foregoing discussion, it is hereby

ORDERED, that Hamilton Beach's motion to preclude Wald's expert testimony is DENIED; and it is further

ORDERED, that the Clerk serve a copy of this order on all parties.